UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:18-CV-315-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| REAL PROPERTY KNOWN AS 223 | ) | |
| SPRING WATER LANE, KNOXVILLE, | ) | |
| KNOX COUNTY, TENNESSEE, WITH | ) | |
| ALL IMPROVEMENTS AND | ) | |
| APPURTENANCES THEREON, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| ROBERT E. TAYLOR, et al., | ) | |
| | ) | |
| Claimants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

In this civil forfeiture proceeding, Claimants challenge the Government's operative complaint, *see* DE 9 (Second Amended Complaint), on two grounds. First, Claimants move to dismiss the pleading for failure "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its" trial burden. Fed. R. Civ. P., Supp. R. G(2)(f) (hereinafter "Rule G"); *see* DE 89 (Motion).[1] Claimants separately move to dismiss the four Defendant real

---

[1] Claimants Robert Taylor, EHC Medical Offices, PLLC, Vista Medical of Alabama, Inc., and Lori Barnett, through counsel, filed the precipitating motion. The Court granted the joinder motions of additional Claimants: Erin & Tyler Hood (DE 91); Eva Misra (DE 93); Evann, Tracie, & Aethann Herrell (DE 94); Danny Robinson (DE 95); and Matthew & Farris Rasberry (DE 97).

1

properties based on an alleged lack of in rem jurisdiction. *See* DE 100.[2] The motions are briefed and ripe for review. *See* DE 104 & 115 (Resps.); DE 107[3] & 117 (Replies).

*The Motions are Untimely*

Rule G(5)(b) provides: "A claimant must serve and file an answer to the complaint or a motion under Rule 12 within 21 days after filing the claim. A claimant waives an objection to in rem jurisdiction or to venue if the objection is not made by motion or stated in the answer." This matter was fully stayed until November 12, 2019. *See, e.g.*, DE 29 (Order vacating DE 5 and entering a provisional stay). The Court's Order granting the Government's renewed stay request on that date expressly excepted from the stay "any Claimant's motion under Supplemental Rule G(8)(b) or petition under Rule G(8)(d)." DE 68 (Order) at 7; *see also* DE 83 at 2 n.1. Thus, the primary Movants'—and the joining parties'—time to file a Rule 12 motion (calculated conservatively) expired during DE 68's effective period (from November 12, 2019, through January 10, 2020). *See* DE 12–15 (Verified Claims of Robert Taylor, Lori Barnett, Vista Medical, and EHC Medical); DE 21–22 (Herrell Verified Claims); DE 53 (Rasberry Verified Claims); DE 59 (Hood Verified Claims); DE 62 (Robinson Verified Claim); DE 63 (Misra Verified Claim).[4]

---

[2] The DE 89 filers are also the DE 100 movants. The Court granted the Herrells' joinder request (DE 101). The joinder motion adds no substantive argument regarding the jurisdictional issue. Thus, the Court does not separately analyze DE 101.

[3] The same cohort—Misra (DE 107), the Hoods (DE 108), the Herrells (DE 109), Robinson (DE 111), and the Rasberrys (DE 112)—joined the reply. Only Dr. Misra added any distinct substantive argument.

[4] The Grenkoskis' January 27, 2020, Verified Claim was the last filed. *See* DE 77. The Court's January 10, 2020, order granting a joint request to extend the stay pending the parties' negotiations did not explicitly extend the exception for Rule G(8)(b) motions. *See* DE 76 (Order). [Though, given DE 89's filing date, the parties obviously viewed the exception as still available under the January 10 extension Order.] However, on April 6, 2020, the Court, in granting another stay extension, expressly renewed the exceptions for Rule G(8)(b) & (d) filings. *See* DE 98 at 10. The Grenkoskis did not move to join the pending dismissal motions. Per Rule G(5)(b), the time to seek joinder or file a motion of their own has now, per the Rule text, expired.

The March 30, 2020 (DE 89), and April 14, 2020 (DE 100), dismissal motions were filed far outside the window provided by the Rules.  Claimants offer no explanation for the tardy filings and did not seek leave to file out-of-time. The Government did not respond on this basis, but the Court must chart the timeliness deficit at the threshold.  As discussed below, the motions also fail on consideration of their merits.

## I.    Pleading Sufficiency

*Applicable Standards*

Per Rule G(2) a forfeiture complaint, among other requisites, must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f); *see also* Rule G(8)(b)(i).

> Few courts have interpreted Supplemental Rule G(2)(f), but the advisory committee's note indicates that the language is designed to codify the "standard" that "has evolved" from case law interpreting its predecessor—Supplemental Rule E(2)(a)—and "carry this forfeiture case law forward without change." Supplemental Rule E(2)(a) requires that a complaint in an admiralty action "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."
>
> The leading case on Supplemental Rule E(2)(a)—again as identified by the advisory committee's note to Supplemental Rule G(2)—is *United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002). *See Gang Luan v. United States,* 722 F.3d 388, 398 n.14 (D.C. Cir. 2013) (interpreting the advisory committee's note as "explaining that Supplemental Rule G(2)(f) was intended to codify the interpretation of Rule E(2)(a) set out in *Mondragon*"). In *Mondragon,* the Fourth Circuit was clear that Supplemental Rule E(2)(a) does not articulate an onerous standard. Looking to the text of the rule, it held that a complaint must "state the circumstances giving rise to the forfeiture claim with sufficient particularity that the claimant] can commence a meaningful investigation of the facts and draft a responsive pleading" and "permit a reasonable belief for pleading purposes that [the property in question] is subject to forfeiture." *Id.* at 866–67.

*United States v. Aguilar*, 782 F.3d 1101, 1108–09 (9th Cir. 2015) (internal alterations omitted). The standard is higher than "notice pleading," but it remains a "low bar." *Id.* at 1109.[5]

The complaint "must provide reasonably detailed facts" that, if accepted as true, support a reasonable belief "that the United States, after the completion of the discovery process," could demonstrate by a preponderance of the evidence that the property is tainted and subject to forfeiture. *United States v. 12 Parcels of Real Prop. Located in Carlisle, Nicholas Cty., Kentucky*, No. 16-CV-43-JMH, 2017 WL 4369485, at *2 (E.D. Ky. Oct. 2, 2017) (collecting cases); *cf. United States v. Real Prop. Located at 2323 Charms Rd., Milford Twp., Oakland Cty., Mich.*, 946 F.2d 437, 441 (6th Cir. 1991) (interpreting Supplemental Rule E(2)(A) in the § 881 context) ("In other words, the complaint 'need not allege facts sufficient to support a reasonable belief that specific property is tainted, but facts sufficient to support a reasonable belief that the government **could demonstrate probable cause**[, at the time, the Government's operative initial trial burden,] for finding the property tainted.'") (emphasis in original).  The measure is not the trial standard but whether the complaint states facts with sufficient detail to support a reasonable belief that the Government can hit the eventual standard "at trial."  *See also United States v. One 1974 Learjet 24D, Serial No. 24D-290, Mexican Registration XA-RMF*, 191 F.3d 668, 674 (6th Cir. 1999) ("The district court erred by requiring the government's complaint to show probable cause, rather than a reasonable belief that, **at the forfeiture trial**, the government could prove probable cause.") (applying pre-CAFRA trial standard) (emphasis in original).

---

[5] The Court sees no need to delve deeply into whether the Rule G(2)(f) standard "requires something less than probable cause," as the Government asserts (and Claimants hotly contest). *See* DE 104 at 7. The Court sees little if any gap between probable cause that predicate A exists and a reasonable belief that predicate A exists.  Reasonable belief is the argot of probable cause.  *See Saltmarshall v. Prime Healthcare Servs.-Garden City LLC*, 831 F. App'x 764 (6th Cir. 2020) (" Under . . . federal law, probable cause exists when the totality of the circumstances . . . supports the reasonable belief that [X condition exists.].").   The Court will hew to the Rule text.

Some courts have found the *Twombly*/*Iqbal*[6] plausibility rubric inapplicable, at least directly, to assessment of a forfeiture complaint under Rule G(2)(f). *See, e.g.*, *United States v. $263,327.95*, 936 F. Supp. 2d 468, 471 (D.N.J. 2013). Given the disparate verbiage of Rule 8(a) and Rule G(2)(f), this finding is understandable. *Cf. 2323 Charms Rd.*, 946 F.2d at 441 (holding pre-CAFRA, and prior to *Twombly* and *Iqbal*, that "Supplemental Rule E(2)(a) imposes a more stringent standard than the pleading requirements of the Federal Rules of Civil Procedure"). However, as one district court ably explained:

> [S]ome of the language used by the Supreme Court to describe the plausibility standard appears to bridge the gap between Rule 8(a) and Supplemental Rule G(2)(f). In *Iqbal*, the Supreme Court stated the plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949 (citation omitted). This is substantially similar to the standard set by Rule G(2)(f)—which requires the Government to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

*United States v. $22,173.00 in U.S. Currency*, No. 09 CIV. 7386 (SAS), 2010 WL 1328953, at *2 n.25 (S.D.N.Y. Apr. 5, 2010). In any event, the Court need not conclude that the Supreme Court's Rule 8 jurisprudence **governs** in a Rule G(2)(f) scenario—and, given the distinct Rule language, the Court does not view *Twombly* or *Iqbal* as fully applicable—to logically reference and incorporate instructive principles from those cases when assessing a civil forfeiture pleading. For instance, the Court sees utterly no reason why the Court, under Rule G(2)(f), would not "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true[.]" *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Nor does the forfeiture scheme suggest that a "[t]hreadbare" elemental recital, "supported by mere conclusory statements," would

---

[6] *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

carry the Government's pleading burden. *Iqbal*, 129 S. Ct. at 1949. Thus, the Court rationally relies on pleading assessment concepts developed in the Rule 8/12 context to the extent they do not conflict with the Rule G(2)(f) standard.[7]

The Court stresses the stage and posture, as it assesses the pleading, not the proof.  The Rule and forfeiture statute make plain that the Government need not allege every supportive fact, and the Government's substantiating proof may post-date the complaint.  *See* Rule G(8)(b) ("In an action governed by [§ 983(a)(3)(D)] the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.  The sufficiency of the complaint is governed by Rule G(2)."); *United States v. Funds in the Amount of $33,534.93 Account No. Ending **8429 From Bank of Am.*, No. CV 11-675 LH/KBM, 2013 WL 12333983, at *6 (D.N.M. Mar. 25, 2013) ("The Court concludes that the totality of facts alleged are sufficiently detailed to apprise Claimant of the basis for the forfeiture action, allowing her to respond by contesting the source of these Funds. She is sufficiently informed to be able to conduct a meaningful investigation. Supplemental Rule G's particularity requirements have been met and thus the Government is able to avoid dismissal under Rule 12(b)(6).") (citing *Mondragon*, 313 F.3d at 866-67).

---

[7] *See* Supp. R. A(2) ("The Federal Rules of Civil Procedure also apply . . . except to the extent that they are inconsistent with these Supplemental Rules."); Supp. R. G Advisory Committee Note ("The Civil Rules continue to provide the procedural framework within which Rule G and the other Supplemental Rules operate."); *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 149 (3d Cir. 2003).  Indeed, Rule G(8)(b) describes the permitted dismissal motion as one made "under Rule 12(b)."  Supp. R. G.

*Applicable Forfeiture Provisions*

As further context for the reasonable belief question, a few words about what the Government's burden of proof would be at trial.

> In a suit or action brought under any civil forfeiture statute for the forfeiture of any property—
>
> > (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;
> >
> > (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and
> >
> > (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. § 983(c). The Government claims that the target property represents proceeds of or facilitated drug trafficking, in violation of 21 U.S.C. §§ 841(a)(1) & 846; represents proceeds of or was involved in money laundering, in violation of 18 U.S.C. § 1957; and/or represents proceeds of health care fraud, in violation of 18 U.S.C. § 1347. *See* DE 9 ¶ 1. Statutory provisions relevant to the Government's asserted theories authorize forfeiture of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [21 U.S.C. §§ 841(a)(1) & 846], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any [such] violation[.][8]
>
> All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of [a felony violation of 21 U.S.C. §§ 841(a)(1) & 846.][9]

---

[8] 21 U.S.C. § 881(a)(6).
[9] 21 U.S.C. § 881(a)(7).

> Any property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property.[10]

> Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" [under 18 U.S.C. § 1956(c)(7)],[11] or a conspiracy to commit such offense.[12]

\* \* \* \* \*

The complaint's supporting affidavit, attached and incorporated into the pleading, DE 9, at 12 ¶ 10, alleges ample particularized facts supporting a reasonable belief that the Government would be able to prove, by a preponderance, that the at-issue property would be subject to forfeiture.  The Court denies the Rule G(8)(b) dismissal motions.

### *Discussion*

Preliminarily, the Court rejects Claimants' efforts to inject factual matter not "integral to the complaint, [ ] public records, or otherwise appropriate for the taking of judicial notice." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (internal quotation marks and citation omitted); *see, e.g.*, DE 89 at 4 ("virtually all experts agree [buprenorphine] is highly effective in assisting patients who want to stop using dangerous drugs of abuse"); *id.* ("EHC developed detailed, evidence-based protocols"); *id.* ("Patients cared for at EHC received detailed evaluations, physician treatment, case management, [and] individual and group counseling."); *id.* at 9 ("At all times, EHC treated legitimate medical issues with medications that are authorized and encouraged by our public health officials."). A "court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial

---

[10] 18 U.S.C. § 981(a)(1)(A).

[11] Section 1956 defines "specified unlawful activity" to include "any act or activity constituting an offense involving a Federal health care offense[.]" 18 U.S.C. § 1956(c)(7)(F). Per 18 U.S.C. § 24(a), the term "Federal health care offense" encompasses the § 1347 crime alleged in the complaint.

[12] 18 U.S.C. § 981(a)(1)(C).

jurisdiction; or [ ] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Government squarely (and reasonably) disputes most of Claimants' factual assertions; most are not linked to any record cognizable at the dismissal stage. The Court does not consider counterstatements (or counter-characterizations) of fact in assessing the pleading.

Concerning the SAMHSA report and other exhibits that arguably[13] constitute public records[14] properly eligible for consideration at the dismissal stage, Claimants attempt to use the documents primarily to create factual disputes that are irrelevant at this step. *Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity[.]"). The Court will address the records if[15] and as it deems appropriate below.

The sufficiency of the Government's complaint hinges on the expressly incorporated, *see* DE 9 ¶ 10, affidavit of IRS Special Agent Crystal Centers. *See* DE 34-1 (Redacted Aff.). After reciting her extensive experience and credentials—including nearly 17 years with the IRS's Criminal Investigation Division, *id.* ¶ 1—SA Centers explains that the provided information flows

---

[13] Neither side truly runs this issue to the ground. The answer does not seem, to the Court, as clear as either side suggests. *Compare Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) ("Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include . . . published reports of administrative bodies[.]"), *with United States v. Bonds*, 12 F.3d 540, 551–53 (6th Cir. 1993) (declining to take judicial notice of a report from the "National Research Committee (NRC) of the National Academy of Sciences (NAS)" and noting that "[t]here is no dispute that the NRC Report exists, but there is considerable dispute over the significance of its contents"). Because the governmental publications do not impact the result, the Court declines to affirmatively rule the documents in or out on the basis of whether they constitute "public records."

[14] The Court does not view, for instance, a "report in the Journal of the American Medical Association Network Open" as the kind of "public record" that the Court can properly consider at the dismissal stage. *Cf.* Fed. R. Evid. 803(8).

[15] The leading Circuit cases on the topic speak of consideration of non-pleading material in permissive rather than mandatory terms. *See Ashland*, 648 F.3d at 467; *see also* Fed. R. Evid. 201 ("may").

from an expansive investigation of EHC Medical Offices, PLLC, ("EHC"), centered on operations in Jacksboro and Harriman, Tennessee, and EHC prescribing, from 2014 through December 2018, of buprenorphine[16] and other controlled substances. *Id.* ¶¶ 6–7. To list some of the most relevant claims, Centers alleges:

1. EHC physicians regularly prescribed dangerous combinations of Suboxone and benzodiazepines. *Id.* ¶ 15

2. EHC providers' "usual [Suboxone] dose" was 24 mg/day. *Id.* at 7 n.1 and accompanying text.[17]

3. Approximately 73% of EHC prescriptions were filled at Kentucky pharmacies. *Id.* ¶ 17.

4. Though "several EHC physicians were approved providers under" Kentucky's Medicaid program, EHC historically accepted only cash for office visits. *Id.* ¶ 18.[18] During the cash-only period, EHC patients used their Medicaid coverage to pay for their prescriptions, but despite the coverage, shelled out cash for their visits. *Id.* After Kentucky mandated that certified providers accept Medicaid, "EHC physicians left Kentucky Medicaid." *Id.* ¶ 19.

5. Dr. Keri McFarlane Bentley "worked at both EHC locations for about two years, starting in mid-2014." *Id.* ¶ 21. Dr. Bentley told investigators that EHC patient records indicated she had seen patients she never actually saw and that her signature appeared on records "without her knowledge or consent[.]" *Id.* Dr. Bentley further reported that Claimants Taylor—EHC's owner and working physician—and Barnett—a nurse, EHC's office manager, and Taylor's

---

[16] In October 2002, the DEA rescheduled "buprenorphine from a Schedule V narcotic to a Schedule III narcotic under the Controlled Substances Act[.]" *Schedules of Controlled Substances: Rescheduling of Buprenorphine From Schedule V to Schedule III*, 67 FR 62354-01, 2002 WL 31234275 (Oct. 7, 2002); *see also* 21 C.F.R. § 1308.13(e)(2) (listing as schedule III "[a]ny material, compound, mixture, or preparation containing [buprenorphine, a] narcotic drug[, or its] salts"). For a schedule III listing, Congress requires the following predicate findings: "(A) The drug or other substance has a potential for abuse less than the drugs or other substances in schedules I and II. (B) The drug or other substance has a currently accepted medical use in treatment in the United States. (C) Abuse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3).

[17] In disputing the significance of this allegation, Claimants state that "[o]fficial government guidance states that typical maintenance dosages range from 4 mg per day to 24 mg of buprenorphine per day." DE 89 at 12. Whether or not the referenced SAMHSA document can properly be considered "official government guidance," in light of the included prefatory language, suffice it to say that that an allegation that EHC providers' "usual dose" was at the **maximum** of the asserted range, rather than above it, is still meaningful.

[18] *See United States v. Mithavayani*, No. 6:17-CR-25-REW, 2019 WL 2125833, at *3 (E.D. Ky. May 15, 2019) (DEA Task Force Officer testified that a clinic accepting "only cash or cash equivalents . . . was a red flag").

girlfriend—used cameras and microphones to "watch everything" at EHC. *Id.* ¶ 22. Per Bentley, Barnett was responsible for physicians' "patient count" and was the only EHC employee "authorized to dismiss non-compliant patients." *Id.*

6. Another former EHC physician, referred to as MD2 in Centers's affidavit, filed a complaint with the Tennessee Department of Health regarding "irregularities at EHC[.]" MD2 reported (A) that clinic employees pre-filled the physical exam portion of patients' "encounter sheet" prior to the visit; (B) "a strong suspicion"—critically, backed by experience working at the EHC clinics in 2014 and 2015—that encounter sheets were modified after visits; (C) that EHC required all physicians to "use the same Pilot liquid blue ink pens when filling out the forms"; (D) "concern that a physician could not perform a complete physical exam on 60-70 patients in a day"; (E) and doubts regarding lengthy, mandatory "assessment questionnaire forms" partly filled out in the waiting room and completed after a visit "without any evaluation of the answers by the doctor[.]" *Id.* ¶ 23.

7. Law enforcement interviewed (in 2016) a LaFollette, Tennessee, pharmacist, whom SA Centers refers to as RX1, "to determine if RX1 had any concerns about any prescribers, patients[,] and/or other pharmacists[.]" *Id.* ¶ 24. "RX1 **immediately** responded by referencing EHC of Jacksboro, TN." *Id.* RX1 advised of several specific concerns. First, after RX1—and other area pharmacists—began asking EHC patients for their primary care physicians' contact information and calling same to ensure they "were aware of, and approved of, the Suboxone prescriptions[,]" EHC "began operating as a primary care facility[.]" *Id.* Second, after RX1 began giving Suboxone recipients a study concluding that such a prescribing regimen should not exceed 6 months, EHC responded with a letter to pharmacies. *Id.* Third, EHC patients presented multiple prescriptions from different physicians on the same day and did not recall which doctor saw them—RX1 believed this to be a prescription pre-signing indicator. *Id.* ¶ 25. RX1 further noted what were, in her opinion, other red flags: (A) EHC had many rotating doctors; (B) EHC accepted only cash but called pharmacies to "preauthorize insurance paying for the prescription"; and (C) carloads of EHC patients arrived at the pharmacy together. *Id.* Finally, RX1 explained that she only fills EHC prescriptions for patients from the LaFollette area and noted that if her employer accepted a new EHC suboxone patient, multiple new EHC patients would soon appear, "almost like they have a network." *Id.*

8. An unnamed Kentucky pharmacist (RX2), reported three red flags that, in his view, indicated possible diversion: (A) EHC specifically contacted RX2 to ask that he fill their prescriptions; (B) Kentucky residents were "traveling out-of-state to obtain a desired combination of drugs"; and (C) EHC patients, including those receiving Medicaid benefits, paid cash for clinic visits. *Id.* ¶ 26.

9. Current and former EHC patients "confirmed that they went out-of-state to EHC in order to obtain greater quantities of Suboxone and to obtain benzodiazepines at the same time." *Id.* ¶ 27. Patients reported: (A) sponsors paid for EHC visits in exchange for controlled

substances;[19] (B) "cursory initial and subsequent office visits" during which "the treating physician did not discuss any treatment plan, counseling, or even bother to learn the nature of the patient's addiction"; (C) "urine drug screens at EHC were unmonitored and allowed patients to bring in another person's [clean] urine"; (D) "when EHC staff discovered drug abuse, including methamphetamine, patients were not counseled in any way, and their prescriptions continued"; (E) some patients "were unsure why they were being prescribed Neurontin." *Id.* One patient alleged that EHC failed to examine his/her arms for readily discoverable track marks even after he/she reported, on an EHC form, intravenous Suboxone use. Another claimed that an EHC physician prescribed Neurontin, essentially, on the patient's demand. *Id.* The affidavit does not state the number of patients.

10. Cooperating witnesses and undercover officers recorded "numerous" EHC visits. *Id.* ¶ 32. On such occasions: "EHC physicians routinely carried pre-filled prescriptions into the patients' examination rooms"; physician-patient interactions were typically "very cursory" and included "little medical evaluation or meaningful" discourse; EHC counselors had similarly "short, superficial [patient] interactions[.]" *Id.* Nonetheless, EHC physicians prescribed controlled substances "on every visit, with only one exception." *Id.*

Claimants call the complaint "barebones." DE 89 at 19. SA Centers's 63-page incorporated statement is nothing of the sort.

The Government's healthcare fraud and money laundering theories hinge on the illicit prescribing allegations. *See* DE 34-1 ¶¶ 19, 35. Medicaid billing for illegal prescriptions would qualify, as would the flow of funds, at the levels alleged, from the cited illicit origins. Prescribing legitimacy is the clear focus of Claimants' challenge.[20] Thus arises the primary question the Court must answer: Does the complaint "state sufficiently detailed facts to support a reasonable belief that the government"[21] will be able to prove by a preponderance at trial that EHC, through its

---

[19] Behavior that, in context, the alleged (and here accepted) claim that Suboxone strips "can be sold on street for $25-35 per strip" readily explains. *Id.* at ¶ 28. A former EHC patient and, per the affidavit credible and reliable, Government cooperator, made two controlled purchases of Suboxone and oxycodone from one such reported—by two former EHC patients—EHC "sponsor[.]" *Id.*

[20] That is, the Claimants do not directly dispute—at least for purposes of this motion—that if the Government could establish that illicit prescriptions issued with knowledge that the recipient would submit claims to a payor like Medicaid, such proof would show a health care fraud violation. Nor do Claimants contend that transacting with proceeds of illegitimate prescribing—if properly proven—in amounts exceeding $10,000 would not violate § 1957.

[21] Rule G(2)(f).

doctors and operation, and as alleged in the document, engaged in illegal prescribing, thus making forfeitable resulting or adequately connected proceeds? Here, the operative pleading does; the call is not close.

In a physician-involved case, to prove a violation of 21 U.S.C. § 841(a)(1) the United States must establish that a doctor knowingly prescribed (1) "outside of the scope of ordinary professional practice (i.e., 'unprofessionally'); and (2) . . . for no legitimate medical purpose (i.e., 'illegitimately')." *United States v. Godofsky*, 943 F.3d 1011, 1021 (6th Cir. 2019); *see also* 21 C.F.R. § 1306.04 (defining an effective prescription, the excepted § 841 path for lawful dispensation or distribution by a DEA licensee, as one "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice"). The Government alleges particularized facts that reasonably paint EHC as (substantially) a sham operation set up to serve a patient cohort significantly funded by traffickers via prescriptions irregularly issued and serving no legitimate medical purpose. Centers's extensive affidavit easily clears the "reasonable belief" hurdle.

Claimants' arguments fall into three general categories: (1) contentions about what the affidavit omits; (2) efforts to cherry-pick debatable opinions; and (3) counterstatements of fact that the Court does not consider at this stage. Critically, "the government is not required to prove its case simply to get in the courthouse door." *United States v. Real Prop. Located at 5208 Los Franciscos Way*, 385 F.3d 1187, 1193 (9th Cir. 2004); *see 2323 Charms Rd.*, 946 F.2d at 441 (finding that the government need not "carry its trial burden at the pleading stage" (footnote omitted)). The Court assesses the full pleading, not isolated allegations. *Cf. Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016). Under applicable law, the Government has met

its pleading burden. For completeness, the Court addresses several of Claimants' most prominent counter arguments.

Claimants criticize Centers's failure to rely on "qualified health care providers" for source information. DE 89 at 8. The argument blatantly ignores the substantial information provided by two former EHC physicians. Claimants also contend that the pharmacists' reports are mere speculation. *See id.* at n.6 (asserting that "there is no evidence offered that prescriptions were pre-signed"). But, two problems: For starters, the Government had no obligation to produce "evidence" to support its factual claims at this stage; for another, Claimants overlook the specific facts that RX1 cited to support her pre-signing opinion. *See* DE 34-1 at ¶ 25 ("patients have presented multiple EHC prescriptions from different physicians on the same day" and did not know which doctor they saw). Moreover, medical expertise is not an unbudging predicate for evaluating prescribing legitimacy. For instance, the Sixth Circuit has held that "lay understanding" is sufficient to parse "distributions [that] plainly exceed medical use." *United States v. Elliott*, 876 F.3d 855, 858, 864 (6th Cir. 2017); *see id.* at 866 (rejecting challenge that expert testimony was necessary to establish that average prescribing "of 120 to 150 oxycodone tablets for a month's use" was illegal where physician's "examinations were cursory, the practices of the [clinic] highly irregular, and the doses prescribed at the clinic clearly in excess of any medical need"), *cert. denied sub nom. Frial-Carrasco v. United States*, 138 S. Ct. 1314 (2018).

As to Claimants' thematic critique of law enforcement opinions, Circuit precedent allows "law enforcement officers [to] offer expert testimony regarding the modus operandi of crimes." *United States v. Cobb*, 397 F. App'x 128, 138–39 (6th Cir. 2010); *United States v. Neeley*, 308 F. App'x 870, 876 (6th Cir. 2009) ("[This Circuit] regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity."). The opinions Centers relates are

founded on substantial investigative experience (not only Centers's, but a seasoned law-enforcement team, to include an SA from the DEA, ¶ 7), informed by extensive review of records from a lengthy investigation, and, most importantly, thoroughly corroborated by copious specific factual allegations.

Claimants also contend that "controlling federal, state and professional standards **require** providers to offer treatment to patients who use benzodiazepines." DE 89 at 9 (emphasis in original). True or not (and the tendered records support no such tortured construction),[22] SA Centers's allegation concerns EHC physicians **regularly prescribing** a benzodiazepine/Suboxone cocktail that Movants acknowledge is dangerous. DE 34-1 ¶¶ 15, 27. Thus, even if, according to SAMHSA (or the FDA, or the ASAM), providers "should not" deny Suboxone to addicts "**solely** because they take benzodiazepines,"[23] that limited proscription does nothing to rebut Centers's claim that EHC doctors habitually prescribed the risky combination. *See United States v. Cannata*, 791 F. App'x 143, 150 (11th Cir. 2019) (characterizing prescribing of "extremely high doses of medication . . . in potentially dangerous combinations" as one of the "hallmarks of a pill mill"); *United States v. August*, 984 F.2d 705, 713 (6th Cir. 1992) ("There are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice.").

Claimants' effort to nullify Centers's representations regarding "the distances [EHC patients] traveled to obtain prescriptions at the clinic[s]" is likewise unavailing. *Elliott*, 876 F.3d at 864 (noting that knowledge of distance and the "extremely short time [the physician] spent with

---

[22] Instruction not to deny on a single basis is a concept distinct from problematic prescription combinations. And, in any event, Claimants do not assert that any guidance document requires **prescribing** of benzodiazepines.

[23] DE 89 at 10.

patients" supported the conspiracy conviction). Despite one EHC location's proximity to the Kentucky border, multiple EHC patients "confirmed that they went out-of-state to EHC in order to obtain greater quantities of Suboxone and to obtain benzodiazepines at the same time." DE 34-1 ¶ 27; *id.* ¶ 26 (RX2 indicating out-of-state travel was a red flag for diversion).[24] Claimants cannot argue into irrelevance the allegation that 73% of the Tennessee clinics' prescriptions were filled out-of-state. *See id.* ¶ 17.

The Court need not tarry long with Claimants' quibble regarding the affidavit's failure to explicitly define "what is meant by cursory visits." DE 89 at 16. In context, the intended meaning is self-evident. A complaint need not contain exhaustive detail. And, the affidavit expressly claims the modifying equivalent: "little medical evaluation or meaningful interaction with [ ] patients." DE 34-1 ¶ 32.

Here and there, Claimants protest the lack of explicit factual assertions concerning EHC staff's knowledge of or direct involvement in illegal activity. Yet, even at trial, the Government would have "no obligation to produce 'direct evidence' . . . , as 'guilty knowledge and voluntary participation may be inferred from surrounding circumstances.'" *United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014) (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)). The Government has alleged a conspiracy, and the necessary criminal pact "may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015) (citation omitted). Further, a defendant's connection to "the conspiracy need only be slight" and a "tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement." *Id.* The

_____

[24] Claimants' Exhibit 5, even if properly cognizable at this stage, is a letter authored nearly 9 months after the events in question. It does not aid the dismissal effort.

16

Affidavit, as to the targeted period, rationally threads together roles and tenures at EHC, specific prescribing allegations, and patient population criteria.

SA Centers avers that Claimant Taylor was EHC's founder and owner; that Claimant Barnett (allegedly in an intimate relationship with Taylor) was EHC's office manager and integral to clinic operations; that Taylor and Barnett monitored all EHC activities by video; that Barnett controlled patient load and held sole authority over patient dismissal decisions; and, of course, that Taylor obtained millions of dollars of proceeds from EHC's business. In this context, a non-physician is not immunized by a lack of medical knowledge. As Judge Thapar ably explained:

> It is true that a defendant cannot knowingly or voluntarily join a conspiracy without first knowing about it. But training is not a prerequisite for knowing about a conspiracy. A pill mill does not run on doctors alone[.] . . . And when the jig is up, these non-doctors are just as liable as the doctors who dispensed the pills. *See, e.g.*, *United States v. Hicks*, 529 F.2d 841, 844 (5th Cir. 1976) (finding "no merit" to the defendant's argument that his conviction for a drug conspiracy should have been overturned because he was "a security guard with a fourth-grade education and not a doctor"); *United States v. Smith*, 573 F.3d 639, 646 (8th Cir. 2009) ("Lay persons who conspire with or aid and abet a practitioner's unlawful distribution of drugs can be convicted under the [Controlled Substances Act] and its regulations."). The relevant inquiry, then, is not whether a defendant was a physician, but whether he knowingly and voluntarily played some part in a conspiracy to distribute drugs.

*United States v. Solomon*, No. 13-CR-40-ART, 2016 WL 10894663, at *5 (E.D. Ky. June 23, 2016); *cf. Direct Sales Co. v. United States*, 63 S. Ct. 1265, 1268 (1943) (rejecting a claim that "so long as the seller does not know there is a conspiracy between the buyer and others, he cannot be guilty of conspiring with the buyer, to further the latter's illegal and known intended use, by selling goods to him").

As to Claimants' numerous arguments concerning tracing, the Government "need not show that all of the claimed property is tainted to satisfy Supplemental Rule G(2)(f)." *Aguilar*, 782 F.3d at 1109 (9th Cir. 2015) ("tracing is not at issue at the motion to dismiss stage"); *see also United States v. One Parcel of Real Prop.*, 921 F.2d 370, 375 (1st Cir. 1990) ("Whether none, all, or only

a portion of the defendant property is forfeitable is not determined at the pleadings stage, but at trial."). To the extent the § 983(c)(3) requirement requires some examination of the Government's potential ability to establish a "substantial connection" at trial,[25] the Court finds that the operative complaint provides sufficient nexus indicia under the G(2)(f) standard.

Claimants argue that the Government has alleged no facts supporting the idea that all EHC care was illegitimate. *See* DE 89 at 17. Yet, the Claimants fail to explain why the Government would need to disprove the existence of any legitimate prescribing to succeed at trial, much less at the pleading stage. Civil forfeiture does "not require evidence linking the funds to specific overt acts." *United States v. $72,050.00 in U.S. Currency*, 587 F. App'x 241, 243 (6th Cir. 2014). Again, § 881 provides for forfeiture of proceeds traceable to drug trafficking, as well as funds used or intended to be used to facilitate such trafficking. The Complaint depicts a host of improper prescribing indicators over a broad temporal period. The facts alleged are enough to justify a reasonable belief that the Government would be able to show, at trial, that "the very nucleus of [EHC's] business model remained rotten and malignant." *United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010). In that scenario, an argument that certain EHC patients "were legitimate [would] gain[ ] no traction." *Id.* If, as SA Centers's affidavit reasonably indicates, EHC was designed to supply and propped up by illegitimate prescribing demand, the fact that an occasional patient with tangible need happened upon the pill mill would not rinse the proceeds from such a visit of criminal taint. If the doors were only open because of the trafficking activity; any non-trafficking profits would, plausibly, be indirect proceeds of the crime. *See Warshak*, 631 F.3d at

---

[25] *Cf. United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, 1548 (11th Cir. 1987) (dismissing complaint under Supplemental Rule E(2) that "contain[ed] not even a whiff of evidence to suggest that the currency is in any way linked to the exchange of a controlled substance").

332.   The Affidavit builds a detailed factual foundation indicative of highly problematic prescribing for a patient population showing badges of diversion (the high-majority of interstate patients, pharmacist concerns, former physician-employee information, full-cash medical visits, specific indicators of diverting conduct).  The Affidavit provides sampling over time and from diverse sources that, when connected to the financial history, extends the established taint to the breadth of the practice.  On the pleading alone, which is the inspection point for the motion, the Affidavit clears the Rule's filter.

Claimants do not assert that the Government's complaint stretches to any property not traceable to operation of EHC.[26] Put differently, the Court sees no indication that the Government is pursuing forfeiture of any property without an EHC tether. And, because SA Centers provides specific facts justifying a reasonable belief that the Government could prove that EHC was in the business of distributing controlled substances for no legitimate medical purpose, outside the course of professional practice, the complaint establishes a sufficient connection between the Defendant property and illicit activity under the G(2)(f) standard. *See* 18 U.S.C. § 981(a)(2)(A) ("[T]he term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the

---

[26] The Government also relies on the money-laundering based § 981(a)(1)(A) and fraud-tied § 981(a)(1)(C). However, the Court sees no need for separate analysis of a money-laundering or healthcare-fraud link. To justify forfeiture based on the § 1957 allegations, the Government would need to establish that the funds were tainted by the alleged trafficking conspiracy. *See* 18 U.S.C. § 1957(a) (criminalizing knowing transactions of $10,000 or more of "criminally derived property"). The Government's § 1347 theory seems wholly derivative of the alleged drug crimes. Nothing about the affidavit suggests that the amounts sought are based on funds that, while allegedly "derived from," "involved in," or "traceable to" alleged laundering or fraud crimes, were not linked to the posited conspiracy. Stated otherwise, the Court sees no indication that the Government could prove **non-EHC-sourced** property had a "sufficient nexus or substantial connection to [any money laundering or fraud] offense." *United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012) (citations and quotation marks omitted). Because the EHC proceeds equal or exceed the total funds allegedly involved in laundering or fraud, the Court conducts no separate § 981(a)(1) analyses.

19

commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."); *cf. United States v. Bradley*, --- F.3d ---, No. 19-5985, 2020 WL 4579391, at *2 (6th Cir. Aug. 10, 2020) (Because "'proceeds' means gross receipts, it is beside the point whether the money stayed in [defendant's] pocket (e.g., kept as profits) or went toward the costs of running the conspiracy (e.g., used to pay coconspirators).") (interpreting § 853(a)); *United States v. One Single Family Residence Located at 15603 85th Ave. N., Lake Park, Palm Beach Cty., Fla.*, 933 F.2d 976, 982 (11th Cir. 1991) ("[U]nder section 881(a)(6), legitimate funds are forfeitable when knowingly commingled with forfeitable funds."); *United States v. Schifferli*, 895 F.2d 987, 991 (4th Cir. 1990) (holding "that there was a substantial connection between [dentist's] office building and his drug offenses" where dentist "used his [ ] office over forty times during a four-month period to write illegal prescriptions for eight individuals" and rejecting argument that "the vast majority of the activity on the subject property was the legitimate practice of dentistry").

### *Other Claimants' Arguments*

Dr. Misra (DE 93 & 107), Danny Robinson (DE 95), the Hoods (DE 91), the Herrells (DE 94), and the Rasberrys (DE 97) each, essentially, contend that the complaint does not sufficiently and specifically implicate them in the alleged illicit activity. Even if the Court accepted that proposition—though the affidavit broadly implicates EHC physicians, specifically addresses conduct of Drs. Herrell, Robinson, and Hood (DE 34-1 ¶¶ 29, 113, 124), and alleges each Claimants' specific receipts from the purportedly illicit enterprise (*Id.* at ¶¶ 74, 86, 89, 113, 124)— alleged innocent ownership or non-involvement in illegality is, in this context and at this stage, not a basis for dismissal. *Cf. Estate of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013) ("[C]ourts generally cannot grant motions to dismiss on the basis of an affirmative

defense[.]")(quoting *Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 599 (6th Cir. 2012). The Government has alleged sufficient facts to establish a reasonable belief that it could prove by a preponderance that EHC was a criminal operation and, thus, a like belief that all clinic income carried a forfeiting taint. Again, no Claimant denies that EHC receipts were the originating source for all of the target property. *See United States v. $506,069.09 Seized From First Merit Bank*, 664 F. App'x 422, 433 (6th Cir. 2016) (explaining that even assets of an individual "not charged with a crime" may "be subject to forfeiture"); *United States v. Sandini*, 816 F.2d 869, 872 (3d Cir. 1987) ("The innocence of the owner [in a civil forfeiture proceeding] is irrelevant—it is enough that the property was involved in a violation to which forfeiture attaches."). "Because the complaint contains either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory," the Court denies the dismissal motion (as to all movants) on the merits. *Id.* (alterations and quotation marks omitted).

Claimants' arguments will have their day.  For now, the complaint, which alerts Claimants to the precise theories in play, allowing meaningful investigation of the facts and framing of a response, passes the applicable standard.  The Government has, "at bottom" stated sufficiently detailed facts to support a reasonable belief that it will be able to meet the proof burden at trial, that is, "that the property is subject to forfeiture."  *Mondragon*, 313 F.3d at 865.

## II.     In Rem Jurisdiction

Claimants' second motion asserts that the Government's failure to comply with the § 985(c)(1) requirements—to post notice of the forfeiture complaint on real property targeted for forfeiture and to serve notice and a complaint copy on the property owner—leaves the Court without jurisdiction over the four real properties named as Defendants. *See* DE 100; 18 U.S.C. § 985(c)(1). The Government concedes that it has not yet posted the notice or served the owners.

Nonetheless, for the following reasons, the Court finds that the acknowledged defects do not warrant dismissal of the real properties.

*Waiver*

Claimants likely waived their challenge to in rem jurisdiction both by not pressing the defense in their initial motion and by their litigation conduct. "Jurisdiction, it has been observed, is a word of many, too many, meanings[.]" *Steel Co. v. Citizens for a Better Env't*, 118 S. Ct. 1003, 1010 (1998) (quotation marks omitted). Though Claimants repeatedly emphasize that the in rem question is "jurisdictional[,]" it is not, like subject matter jurisdiction, a non-waivable defense. *See, e.g.*, Rule G(5)(b) ("A claimant waives an objection to in rem jurisdiction or to venue if the objection is not made by motion or stated in the answer."). Rule 12(g) bars successive dismissal motions based on "a defense or objection that was available" but omitted from the first motion. Fed. R. Civ. P. 12(g)(2). And, a party waives a Rule 12 defense by: "omitting it from a motion" as described in Rule 12(g)(2); or "failing to . . . make it by motion under this rule[.]" Fed. R. Civ. P. 12(h)(1). "This consolidation rule is intended to eliminate unnecessary delay at the pleading stage by encouraging the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense simultaneously rather than interposing these defenses and objections in piecemeal fashion." *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (quotation marks omitted); *accord Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978); *see also Leyse*, 804 F.3d at 321 ("The procedural bar of Rule 12(g)(2), however, covers all motions to dismiss for failure to state a claim, regardless of the grounds asserted.").[27]

---

[27] *Cf. Brooks v. Warden*, 706 F. App'x 965, 968 (11th Cir. 2017) ("The fact that motions to dismiss for failure to exhaust are not expressly mentioned in Rule 12(b) is not unusual or problematic. The normal pleading rules apply. . . . [A]s an unenumerated Rule 12(b) motion, the exhaustion defense is subject to the rules and practices applicable to the most analogous Rule 12(b) motion[.]") (citations and quotation marks omitted).

Here, Claimants first moved under G(8)(b), which cross-references Rule 12(b), for dismissal based on alleged inadequacy of the complaint under Rule 12(b)(6)—though assessed through the Rule G(2)(f) lens. *See* Rule G(8)(b)(ii). Claimants had to simultaneously press any Rule 12(b)(2)–(5) dismissal basis. The initial motion did not advance deficiencies with in rem jurisdiction as a dismissal ground.[28] Thus, the serial dismissal effort is procedurally deficient.

Claimants' extensive litigation participation—particularly the repeated challenges to the forfeiture merits (both in the pending dismissal motion and in prior findings)—also suggest conduct-based waiver of any in rem jurisdictional argument. *See King v. Taylor*, 694 F.3d 650, 658 (6th Cir. 2012) ("Even where a defendant properly preserves a Rule 12(b) defense by including it in an answer, he may forfeit the right to seek a ruling on the defense at a later juncture through his conduct during the litigation.") (footnote omitted) (collecting cases); *see also Boulger v. Woods*, 917 F.3d 471, 477 (6th Cir. 2019) ("Determining what constitutes waiver by conduct is more an art than a science and there is no bright line rule.") (alterations omitted). The test, in the analogous personal-jurisdiction context, is "whether a [movant's] conduct prior to raising the defense has given the [non-movant] a reasonable expectation that the [movant] will defend the suit on the merits or whether the [movant] has caused the court to go to some effort that would be wasted if [ ] jurisdiction is later found lacking." *King*, 694 F.3d at 659. Here, Claimants asserted merits and due-process-based challenges in opposition to stay requests; they repeatedly sought discovery; and, as already explained, squarely (if unsuccessfully) challenged the factual

---

[28] The single desultory reference to "in rem jurisdiction" on the twenty-first page of the initial filing does not alter the Court's analysis. *Patterson v. Whitlock*, 392 F. App'x 185, 193 (4th Cir. 2010) (finding that an explicit but generic reference to deficient service of process was insufficient "to preserve that defense[,]" stating that "Defendants waived their opportunity to challenge [ ] service of an incomplete Complaint when they filed an Answer that attacked the sufficiency of process in barebones fashion only," and collecting cases).

sufficiency of the complaint. Claimants "actions demonstrate that [they] sought to have the [C]ourt use its power over the [property] to reach a decision on the merits[,]" and such "participation in the litigation gave [the Government] a reasonable expectation that [Claimants] would defend the suit on the merits." *Bougler*, 917 F.3d at 477–78. Thus, on Rule- and conduct-based grounds, the Court finds that it could treat Claimants as having waived their in rem jurisdictional challenge. In any event, the merits resolve against them.

*Jurisdictional Merits*

"[T]he Government shall initiate a civil forfeiture action against real property by":

(A) filing a complaint for forfeiture;
(B) posting a notice of the complaint on the property; and
(C) serving notice on the property owner, along with a copy of the complaint.

18 U.S.C. § 985(c)(1). "If real property has been posted in accordance with this subsection, it shall not be necessary for the court to issue an arrest warrant in rem, or to take any other action to establish in rem jurisdiction over the property." *Id.* at (c)(3). CAFRA identifies acts that are <u>sufficient</u> to establish in rem jurisdiction. However, the statute does not purport to set forth an irreducible jurisdictional minimum. The *Good* case, which Claimants heavily emphasize, does not instruct otherwise. *United States v. James Daniel Good Real Prop.*, 114 S. Ct. 492 (1993) (hereinafter "*Good*"). CAFRA's verbiage tracks the *Good* Court's ruling on this topic: "In the case of real property, the res **may be** brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant." *Id.* at 503 (emphasis added). *Good,* like CAFRA, identifies sufficient, not necessary, conditions for in rem jurisdiction.

The Second Circuit has held: "If it chooses, the government may initiate forfeiture proceedings of real property containing a home without a seizure by filing a complaint and protecting against transfer of the property by filing a lis pendens." *United States v. Premises &*

*Real Prop. at 4492 S. Livonia Rd., Livonia, N.Y.*, 897 F.2d 659, 661 (2d Cir. 1990). Here, the Government did both. Claimants provide no compelling justification for treating the Second Circuit's conclusion as an invalid basis for in rem jurisdiction.[29] Indeed, Claimants bemoan the Government's lis pendens filing as effecting a restraint on the real properties on par with an actual seizure. *See* DE 100 at 7 ("The properties have effectively been restrained since December 12, 2018."). An actual seizure would undoubtedly establish in rem jurisdiction. Given Claimants' acknowledgment of the constructive restraint now imposed on the property, the Court fails to see how the current posture affords any less constructive control over the at-issue res than completion of the procedure § 985(c)(1) envisions. *Cf. United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills California*, 298 F. App'x 545, 551 (9th Cir. 2008) ("[A]n arrest warrant does not need to be served on the property for a court to obtain jurisdiction.").[30]

Importantly, Rule G(3)(c)(ii) provides that an "authorized person or organization must execute . . . any supplemental process on property in the United States as soon as practicable unless . . . the action is stayed before the . . . supplemental process [is] executed[.]" Rule G(3)(c)(ii)(B). Two days after the Government filed the complaint, Judge Van Tatenhove stayed this matter "pending resolution of the criminal investigation[.]" DE 5 at 2.  Section 985(c)(1) notice posting and service strikes the Court as precisely the kind of supplemental process within Rule

---

[29] Certainly, to the extent that *4492 S. Livonia Rd.* purports to set forth a complete listing of necessary requisites for initiating a forfeiture suit, CAFRA supplants the holding. However, as explained, CAFRA does not purport to present the definitive explication of methods for establishing in rem jurisdiction. And the mere fact that posting and service is required for properly initiating a forfeiture suit does not render those acts in rem jurisdictional predicates. In rem jurisdiction is a concept that long preceded CAFRA's enactment, and Congress expressed no intent to close existing jurisdictional routes.

[30] The *Good* Court, noting the antiquated rationale of prior contrary precedent, found that "when the res is real property, . . . actual seizure" is not required because the concerns animating that requirement are inapplicable to immobile real property—*i.e.*, "the appropriate judicial forum may be determined without actual seizure." 114 S. Ct. at 503.

G(3)(c)(ii)'s ambit—*i.e.*, process for which execution may be delayed while the matter is stayed.[31] As Claimants point out, Rule G(3)(a) provides that the Government must "proceed" under § 985 if "the defendant is real property[.]" However, nothing in in that provision indicates that Rule G(3)(c) is inapplicable in a real property context. Subsections (a), by cross reference, and (b) identify the types of process authorized for "Real" and "Other Property." Subsection (c) provides the mechanics for executing authorized process for all property. *See United States v. Real Prop. Known as 6656 Skyline Drive, Delray Beach, Fla. 33140*, No. 9:15-CV-80123, 2016 WL 11080257, at *2 (S.D. Fla. Aug. 8, 2016) (Rule "G(3)(c) applies to all types of property. The Court sees no reason or basis in the text of Supplemental Rule G(3) to conclude, as Claimants argue, that G(3)(c) does not apply to real property."). Consider, subsection (c) addresses handling of warrants **and** "any supplemental process"; the only type of process that subsection (b) names is a warrant. If subsection (c) were applicable only to subsection (b) property, the "any supplemental process" language would be surplusage. On the other hand, § 985 contemplates various forms of supplemental process (and warrants, in appropriate circumstances), including the posting and service requirements at issue here. Section 985 provides no guidelines of its own to govern timing for executing the process it authorizes/mandates. Thus, the Court finds that Rule G(3)(c)'s

---

[31] This delay mechanism also bolsters the Court's jurisdictional conclusion.

execution framework applies to § 985(c)(1) process and that the persisting stay justifies the Government's delay, to date, in posting and service.[32]

Though operation of G(3)(c)(ii) justifies the posting-and-service delays thus far, the Government now seeks a partial lifting of the stay to execute the supplemental process. As Judge Hood once explained: "[T]he Government cannot take further [substantive] action in this matter with regard to the Kentucky real property until the civil forfeiture is properly initiated by meeting all three requirements set forth in 18 U.S.C. § 985(c)(1)." *United States v. Real Prop. & Residence Located at 4816 Chaffey Lane*, No. 5:08-CV-410-JMH, 2010 WL 147211, at *5 (E.D. Ky. Jan. 8, 2010). Thus, in order for this case to proceed once the stay is lifted, the Court finds the Government's request warranted.[33]

Finally, given that Claimants failed to prevail—"substantially" or otherwise, *see* 28 U.S.C. § 2465(b)(1)—on any issue (and the Court sees utterly no indications of bad faith),[34] the Court denies Movants' fee request. "A claimant does not substantially prevail unless a court orders the

---

[32] Even if G(3)(c) did not excuse the delay, the Court, on this record, would find dismissal unwarranted. Congress could have specified dismissal as the consequence for deviations from § 985(c)(1); the statute provides no such remedy. *See Good*, 114 S. Ct. 492, 506 (1993) ("We have held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."); *cf. United States v. Vazquez-Alvarez*, 760 F.3d 193, 198 (2d Cir. 2014) ("[T]he provisions of § 983 are procedural rules for pursuing the forfeiture of seized assets," not "conditions of subject matter jurisdiction.") (quoting *United States v. Wilson*, 699 F.3d 789, 795 (4th Cir. 2012); *United States v. Real Properties located at 7215 Longboat Drive (Lot 24)*, 750 F.3d 968, 974 (8th Cir. 2014) (after finding that "the government did not comply with the notice regime laid out in Supplemental Rule G[,]" remanding not for jurisdictional dismissal but for "a merits determination on the [claimants'] claims to the properties").

[33] *Cf. Troxell v. Fedders of N. Am., Inc.*, 160 F.3d 381, 382–83 (7th Cir. 1998) (Under Rule 4(m), additional time to serve is mandatory "if the plaintiff shows good cause for the failure to serve in a timely way," but "[e]ven if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of time for service.") (alterations omitted).

[34] After Judge Van Tatenhove stayed the matter, the Government filed the current operative pleading and expressly advised that it planned to await "unsealing . . . and lifting of the stay" before completing its § 985(c)(1) obligations. *See* DE 9 at 5.

government to afford that claimant some relief." *United States v. Grossi*, 624 F. App'x 447, 448 (9th Cir. 2015). Here, the Claimants specifically opposed the Government's post-and-serve request. *See* DE 100 at 5. The Court is granting that ask.  Claimants clearly did not "prevail" on that (or any other) issue.

III.    **Conclusion**

For all these reasons, the Court **ORDERS** as follows:

1.  The Court **DENIES** DE 89 and DE 100;

2.  The Court **GRANTS** DE 116 to the extent the Government asks for an exception to the stay (which persists, pending the Court's imminent resolution of DE 119) for the limited purpose of permitting notice posting and complaint service pursuant to § 981(c)(1); and

3.  The Government **SHALL** comply with the lingering § 981(c)(1) requisites as soon as practicable.

This the 15th day of January, 2021.

Signed By:

*Robert E. Wier*

**United States District Judge**